908 F.2d 966
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
James P. ANDERSON, Plaintiff-Appellant,
v.
Louis W. SULLIVAN, Secretary of Health and Human Services,
Defendant-Appellee.
 No. 89-2737.
 United States Court of Appeals, Fourth Circuit.
 Argued June 4, 1990.
Decided July 11, 1990.
As Amended July 23, 1990.
 
 Appeal from the United States District Court for the Southern District of West Virginia, at Bluefield. Charles T. Cunningham, United States Magistrate. (CA-88-1106-1)
 Deborah Kay Garton, Hensley, Muth, Garton and Hayes, Bluefield, W.V., for appellant.
 Lawrence John Harder, Assistant Regional Counsel, Office of the General Counsel, Department of Health and Human Services, Philadelphia, Pa., (argued), for appellee, Beverly Dennis, III, Chief Counsel, Region III, Charlotte Hardnett, Chief, Social Security Litigation Division, Office of the General Counsel, Department of Health and Human Services, Philadelphia, Pa., Michael W. Carey, United States Attorney, Gary L. Call, Assistant United States Attorney, Charleston, W.V., on brief.
 S.D.W.Va.
 REVERSED AND REMANDED.
 Before POWELL, Associate Justice (Retired), United States Supreme Court, Sitting by Designation, and WIDENER and MURNAGHAN, Circuit Judges.
 PER CURIAM:
 
 
 1
 James P. Anderson has appealed from an order of the United States District Court for the Southern District of West Virginia which affirmed the Secretary of Health and Human Services' denial of his claim for Social Security disability benefits under Title XVI of the Social Security Act, as amended, 42 U.S.C.A. Secs. 1381 et seq. (West 1983 & Supp.1989). Finding that the Secretary erred by not giving the requisite weight to the opinions of two of Anderson's treating physicians, we reverse the district court's judgment and remand with instructions to the Secretary for a computation and award of benefits.
 
 I.
 
 2
 Anderson first filed an application for disability insurance benefits on June 9, 1981, after he underwent aortic valve replacement surgery in May 1981. The Secretary denied the claim at the initial level of administrative review and Anderson did not appeal that determination. He filed another application for benefits on September 6, 1986. The Secretary denied the claim initially and upon reconsideration. Anderson requested a hearing before an administrative law judge. At the hearing on July 6, 1987, Anderson appeared pro se and described his medical difficulties, primarily as a result of his aortic valve replacement, with chronic problems of overall poor exertional tolerance and episodes of dizziness, including syncopal and near syncopal episodes.[1] The ALJ issued a decision on February 18, 1988, finding that Anderson was able to perform some of his past relevant work and consequently was not entitled to disability insurance benefits. See 20 C.F.R. Sec. 404.1520(e) (1989). The Appeals Council declined to review Anderson's request for review and he filed a complaint in the United States District Court for the Southern District of West Virginia. On May 26, 1989, the district court, per United States Magistrate Charles T. Cunningham, concluded that the Secretary's decision was supported by substantial evidence and ordered that the Secretary's judgment be affirmed. The magistrate also denied Anderson's subsequent motion to alter or amend the judgment. The appeal followed.
 
 II.
 
 3
 At the administrative hearing both Anderson and his wife testified. The ALJ asked a vocational expert, John E. Proffitt, Jr., to testify. Anderson's medical history is found in the hospital records, doctor's reports, and letters from his doctors that were marked in evidence.
 
 
 4
 Anderson was 50 years old at the time of the administrative hearing. He was born with a congenital heart defect. In May 1981, Anderson was admitted to Bluefield Community Hospital in Bluefield, West Virginia, complaining of chest pain. Dr. Radha K. Krishnan, an internist, was his attending physician. Dr. Krishnan referred Anderson to Duke University Medical Center. In July 1981 a doctor at Duke diagnosed aortic insufficiency and stenosis with aneurysmal dilation of the ascending aorta. Surgeons at Duke performed an aortic valve replacement and aortic grafting. They prescribed Coumadin, an anticoagulant medication, which Anderson has been taking ever since. Anderson described his hypertension as well as the prescribed medication he takes to control his tendency to get too excited and nervous.
 
 A. Anderson's Vocational History
 
 5
 Up until the operation, Anderson had held a variety of jobs. He was an auditor from 1963 to 1965; a bookkeeper with a bank from 1965 to 1967; an audit clerk with the McDowell County tax department from 1970 to 1973. From 1973 to 1982 he worked as a corrections officer. He had to sign a waiver form to do the necessary periodic training for the job because he had passed out several times during the training (before the valve operation). After the operation and when the state prison closed, Anderson worked as a jailer for McDowell County from 1982 to 1983. He testified that the job was getting to be physically too much for him and he asked the county for another job. He then worked as a computer operator from 1983 to 1985, and as a field worker for the state in the summer of 1985. He was a librarian for five and one-half months between 1985 and 1986. After that, for four months, he was a "sort of general laborer" with the West Virginia State Road Commission until the job ended on June 6, 1986. Anderson testified that the job was very difficult for him to do, loading and unloading trucks. In his application for benefits, he lists the beginning date of his disability as the day after the state road job ended.
 
 B. Medical Evidence
 
 6
 Dr. Krishnan had been treating Anderson since May 1981 and had referred him to Duke for the valve operation. In March and April of 1984, Anderson was hospitalized again for injuries (broken ribs, contusions, and abrasions) suffered in an auto accident. He reported that he had a dizzy spell and blacked out immediately prior to the accident. Dr. Krishnan felt that Anderson suffered an embolic episode as a result of his replaced aortic valve. An embolic episode is the sudden blocking of an artery by a clot or foreign material. Anderson was in the hospital for nine days and told to avoid driving and not to return to work until seen again by Dr. Krishnan. Anderson missed a total of six weeks of work.
 
 
 7
 On several occasions between 1984 and 1986, Anderson saw Dr. William H. Van Dyke, an internist. The medical records of Van Dyke document Anderson's office visits for various complaints over the years including his recovery from the injuries suffered in the auto accident. These records show nothing unusual other than the reason for the visit, i.e., abscess, infections, and possible pneumonia, and report Anderson to be doing well.
 
 
 8
 Anderson returned to Duke in September 1986 for evaluation of a newly discovered goiter. Anderson was seen by Dr. George J. Ellis, III, a Duke University endocrinologist, who confirmed the diagnosis of multinodular goiter. By way of history, Ellis' notes report the Coumadin therapy and that Anderson had suffered two embolic episodes in 1983 and 1984 which resulted in left-sided weakness lasting up to a day. The report noted that Anderson was anxious and depressed over his employment situation. Ellis' notes indicate that he referred Anderson to a Dr. Floyd who might "provide a leverage that might help encourage employers to accept him but he [Anderson] decided to cancel that appointment." In October 1986, Ellis wrote to Anderson that he should continue to take his thyroid medication, report any changes in his symptoms, and visit again in December.
 
 
 9
 In February 1987, Dr. Krishnan wrote a letter "to whom it may concern" confirming his continued treatment of Anderson, outlining Anderson's embolic episodes and cardiac arrhythmias, and Coumadin therapy. Krishnan opined that on the basis of his findings Anderson was "totally and permanently disabled from any occupation.... He would be a high risk for employment with his conditions."
 
 
 10
 Also in February 1987, Dr. H.A. Cofer prepared a report in which he noted that he had followed Anderson for approximately one year for management of valvular disease resulting in numerous syncopal episodes and chest pains. The report indicated that the Coumadin therapy insuring proper function of the artificial valve resulted in brief episodes of loss of consciousness and a predisposition toward general hemorrhage. Cofer strongly advised that Anderson not be considered for any full-time employment and that Anderson could not tolerate his previous employment as a guard.
 
 
 11
 Dr. Bhasker R. Pujari, a urologist, reported in May 1987 that he had cared for Anderson since 1978 and that Anderson had previously had a prostatic infection and some bleeding in his urine. Pujari had traced the bleeding to Anderson's left kidney and suspected a fistula (an abnormal passage between two organs). The procedure required to confirm the diagnosis could not be performed without discontinuing the anticoagulation therapy. As Pujari felt the heart condition was more important to control than identifying the cause of the blood in Anderson's urine, the left renal pathology remains undiagnosed.
 
 
 12
 At the hearing, Anderson testified that he experienced symptoms such as passing out, dizziness, and blackouts. Anderson testified that he may have such an attack twice a week, once every two weeks, once or twice a month, etc. Though the episodes do not occur with predictable regularity, Anderson estimated that he averaged at least two episodes every month. Anderson also testified that he does become upset and excited but tries to control it with Ativan, prescribed by both Dr. Van Dyke and Dr. Cofer.
 
 C. Vocational Expert's Testimony
 
 13
 Assuming that Anderson's ability to engage in light work would be limited because of the risk of blackouts, the expert John E. Proffitt opined that Anderson could work at his former jobs of computer operator, auditor, or clerk. The ALJ posed the hypothetical of how Anderson's employability would be affected by absenteeism. The expert stated that unpredictable absenteeism, i.e., six days a year, would affect Anderson's employability and "is not acceptable by most employers." Another hypothetical posed by the ALJ added the factor of low stress. The expert testified that the jobs previously mentioned were stressful and if Anderson needed a low stress job, he would be unemployable. The expert stated that:
 
 
 14
 [w]ith his unpredictable black-outs including the stress level, even with his transferability and history of the skill or semi-skilled work, I personally do not feel that he can engage in any occupation primarily because of the limits due to the black-outs, no heights, no driving, the unpredictable absenteeism.... So, I do not believe that there are any jobs in significant numbers he could engage in.
 
 III.
 
 15
 In reaching the conclusion that Anderson could still perform some of his past jobs, the ALJ reviewed Anderson's testimony at the hearing in which Anderson outlined his chronic problems of overall poor exertional tolerance and dizziness, including the syncopal and near syncopal episodes. The ALJ did not specifically mention any of Anderson's treating physicians, but did refer to the medical records immediately before and after the valve operation and the medical records surrounding Anderson's automobile accident. He also noted by exhibit number the medical records of Drs. Ellis, Pujari, and Cofer. The reference to Dr. Cofer's report only noted the conclusion that Anderson could not return to his work as a correctional officer. The ALJ did not mention the finding of Dr. Krishnan that Anderson was totally and permanently disabled or refer to the portion of Dr. Cofer's report that "it is strongly advised that this gentleman not be considered for any full time employment."
 
 
 16
 The ALJ, in denying benefits, determined that a decision could not be made based on "work activity or on medical facts alone." The ALJ then assessed Anderson's remaining capacity for work and the physical and mental demands of the work he had done in the past and concluded that Anderson could do some past relevant work, namely that of a light exertional level. The ALJ made no mention of the vocational expert's testimony at all, much less mention the expert's conclusion, related to an estimate of two or more blackouts per month, that if Anderson had six or more unpredictable absences a year or needed a non-stressful job, he was unemployable.
 
 
 17
 Upon review, the magistrate found the ALJ's conclusion to be supported by substantial evidence. In its review, the lower court did at least specifically mention the reports of Drs. Cofer and Krishnan. The magistrate also referred to the medical records of Dr. Van Dyke and Dr. Ellis. The lower court summarized its review of these last two doctors' medical records of Anderson by stating that "[i]t is fair to say that neither [of those doctors] have indicated whether [Anderson] can work or not, but they have not indicated disability."
 
 
 18
 The magistrate then went on to note that the ALJ had not made a finding that Anderson was precluded from stressful working conditions and "there is really no medical evidence to substantiate a finding that he should be precluded from stressful situations." In the absence of such a finding, the magistrate relied on the testimony of the vocational expert in reaching the conclusion that Anderson could perform at least a portion of his past relevant jobs.
 
 IV.
 
 19
 On appeal, Anderson makes the very valid point that the ALJ did not mention the findings of Drs. Krishnan and Cofer that Anderson was disabled and unsuitable for full-time employment. Anderson points out that, while the district court at least noted the opinions of the two treating doctors, it gave them little or no weight in the face of no opinion on the question of disability by the other doctors.
 
 
 20
 The opinions of the treating physicians, if supported by objective medical evidence, are entitled to great weight. See Coffman v. Bowen, 829 F.2d 514, 518 (4th Cir.1987) (" 'A treating physician's testimony is ignored only if there is persuasive contradictory evidence.") (citing Foster v. Heckler, 780 F.2d 1125, 1130 (4th Cir.1986) (emphasis in original)). The ALJ did not provide a rejection of the conclusions of disability offered by Dr. Cofer and Dr. Krishnan; rather he ignored them.
 
 
 21
 The magistrate did at least mention the statements of the two doctors and compare the findings to the lack of any finding on the question of disability from the other two doctors. Anderson argues that the lower court's reasoning would indicate that he thought all physicians must concur in a conclusion of disability. It is important to emphasize that Drs. Ellis and Van Dyke did not state that Anderson was not disabled, rather they made no mention of his disability or lack thereof at all.
 
 
 22
 The Secretary contends that there is, nevertheless, substantial evidence to uphold the ALJ's findings. In its review of the evidence, however, the Secretary makes no mention of the Fourth Circuit cases which articulate the "attending physicians" rule. See Coffman, 829 F.2d at 518; Foster v. Heckler, 780 F.2d 1125, 1130 (4th Cir.1986); Evans v. Heckler, 734 F.2d 1012, 1015 (4th Cir.1984); Mitchell v. Schweiker, 699 F.2d 185, 187 (4th Cir.1983). The Secretary cited Coffman only for the statement that even a treating physician's opinion may be disregarded if contradicted by persuasive evidence.
 
 
 23
 In urging that the record does support the ALJ's findings, the Secretary relies on the fact that Anderson listed the date of disability on his benefit application as the day after his last job ended. That fact was never mentioned by either the ALJ or the magistrate but was made much of by the Secretary both in the government's brief and at oral argument. The ALJ specifically found that Anderson's claim only faltered at step four of the sequential analysis required, i.e., that Anderson is capable of performing some of his past jobs, those of the light and sedentary variety. See 20 C.F.R. Sec. 404.1520(e) (1989). The last job Anderson had was that of a road worker, a job requiring heavy lifting.
 
 
 24
 In light of the ALJ's specific finding that Anderson is physically unable to return to his last job, we find the Secretary's reliance on the timing of Anderson's claim to be troubling. Certainly in some cases the timing of a claim may raise an inference that a claimant only sought benefits because a job ended and that the claimant was not disabled. An equally plausible inference also would be that a claimant could have legitimately applied for benefits earlier but did not because of heroic efforts to keep working. Under the facts of Anderson's case, he having already sought and been denied benefits, the second inference is the more credible. It appears that the Secretary would have the Court decide that every time someone files a claim for disability benefits at the end of a job, he or she is by definition not disabled, even if, as here, the ALJ finds that the claimant could not perform the recently terminated employment. Such a conclusion would discourage people from continuing to work as long as possible and would strongly suggest that their most prudent course would be to apply for disability benefits at the earliest moment.
 
 
 25
 The Secretary next finds substantial evidence to support the ALJ's finding in an analysis of the medical records of Drs. Ellis and Van Dyke. Dr. Ellis last saw Anderson on September 25, 1986. Ellis' report is a summary of Anderson's health history, noting that he has shortness of breath. In evaluating Anderson's condition since the valve replacement, Ellis noted the embolic episodes and the car accident. The report then described Anderson's condition as follows: "status post valve replacement doing well despite previous embolic and bleeding complications." In noting Anderson's anxiety and depression, Ellis stated:
 
 
 26
 Anxiety and depression have been minor problems related to his unemployment, which seems irreversible in this high unemployment area. He has applied for disability. I suggested that he might want to review the situation with Dr. Floyd to see if Dr. Floyd could provide a leverage that might help encourage employers to accept him, but he decided to cancel that appointment.
 
 
 27
 The government uses this statement from Ellis as evidence that Ellis thought that Anderson could work. Though a plausible inference, it may also very well be that Ellis was trying to help his patient in any way possible with the anxiety and depression because of the lack of work. Ellis did not say that Anderson was or was not disabled.
 
 
 28
 Next, the government goes over Dr. Van Dyke's records of Anderson's visits. Again, these office visits find Van Dyke noting that Anderson was doing well after his auto accident and surgery. Anderson stopped seeing Van Dyke in 1986, a fact that the government finds "odd" and which leads it to conclude that "plaintiff simply had no disabling problem."
 
 
 29
 The Secretary's conclusions are inferences that can be drawn from the evidence. The inferences, however, are not the substantial evidence or the persuasive contradictory evidence necessary to overcome the great weight to be given to the two treating physicians' specific findings of disability.
 
 
 30
 The Secretary argues that the opinions of Drs. Cofer and Krishnan do not show that Anderson was disabled, because those opinions are unsupported by the record, in that the opinions do not contain contemporaneous treatment notes. The Secretary also states that these opinions are contradicted by the lack of any specifically stated opinion on the subject of disability in the records of Ellis and Van Dyke.
 
 
 31
 We have previously flatly rejected the analysis the Secretary would have the Court give to Cofer's and Krishnan's opinions. See Coffman v. Bowen, 829 F.2d 514, 517-18 (4th Cir.1987) (the ALJ gave no weight to the treating physician because his statement was conclusory and without record support; the Court reversed citing the rule that the opinion can only be disregarded if contradicted by persuasive contradictory evidence). The Secretary's reliance on the inferences it draws from the silence of the other two physicians on Anderson's ability to work and the timing of his claim do not amount to the persuasive contradictory evidence necessary to rebut the great weight due to the opinions of Drs. Cofer and Krishnan.
 
 
 32
 Similarly, the record as a whole does not contain the substantial evidence necessary to support the ALJ's finding that Anderson is able to perform some of his past jobs. Such a conclusion is confirmed by the vocational expert's response to the hypothetical questions framed by the ALJ that if Anderson had six or more unpredictable absences a year or needed a low stress job, he would be unemployable. The record evidence of absences and frequent blackouts as well as the evidence of the medication Anderson takes for stress leads us to conclude that those two hypotheticals are indeed real conditions for Anderson and that he is consequently unemployable. Accordingly, we reverse and remand to the district court for entry of an order directing the Secretary to award benefits.
 
 
 33
 REVERSED AND REMANDED.
 
 
 
 [1]
 Syncope is a temporary suspension of consciousness